Jennifer F. Novak, SBN 183882
jennifer.novak@jenniferfnovaklaw.com
LAW OFFICE OF JENNIFER F. NOVAK
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, California 90274
Telephone:   (310) 896-2332
Facsimile:   (310) 265-4499

Colin Kelly, SBN 266956
colin@coastkeeper.org
ORANGE COUNTY COASTKEEPER
INLAND EMPIRE WATERKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone:   (714) 850-1965
Facsimile:   (714) 850-1592

*Attorneys for Plaintiffs Orange County Coastkeeper*
*& Inland Empire Waterkeeper*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation, and INLAND EMPIRE WATERKEEPER, a California non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> SAN BERNARDINO STEEL, INC., a California Corporation, and THE HERRICK CORPORATION, a California Corporation <br><br> Defendants. | Case No.: 5:15-CV-1256 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*)** |

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Waterkeeper" or "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.* ("Clean Water Act" or "Act"). *See* U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On April 17, 2015, Waterkeeper issued a 60-day notice of intent to sue letter ("Notice Letter") to San Bernardino Steel, Inc. and the Herrick Corporation (collectively, "SBS" or "Defendants") for their violations of the Clean Water Act. The Notice Letter was also sent to the registered agent for each defendant as required by 40 C.F.R. § 135.2(a)(2). The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Water Board"), and the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Water Board"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached to this complaint as Exhibit A and is incorporated here by reference.

3.    More than sixty (60) days have passed since the Notice Letter was served on Defendants and the EPA, State Water Board, and Regional Water Board as oversight federal and state agencies. Plaintiffs are informed and believe, and therefore allege, that neither the EPA, nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the Clean Water Act. 33 U.S.C. § 1319(g).

4.    This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from their operations, located at 5454 Industrial Parkway, San Bernardino, California, 92407 (the "Facility"). Specifically,

Defendants discharge polluted storm water and non-storm water from the Facility into storm drains that discharge directly into waters of the United States.  Defendants have both substantively and procedurally violated California's Permit for Discharges of Stormwater Associated with Industrial Activities (National Pollution Discharge Elimination System General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("Storm Water Permit").

5.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, because the sources of violations are located within this judicial district.  33 U.S.C. § 1365(c)(1).

## II.   **INTRODUCTION**

6.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into the storm drains and local waterways.  The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year.  These Receiving Waters are ecologically sensitive areas.  Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species.  Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities.  The public's use of the Receiving Waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges.  Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

7.     This complaint seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

8.     Waterkeeper specifically alleges that Defendant's discharges of pollutants from the Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

**III.   PARTIES**

**A.     Inland Empire Waterkeeper and Orange County Coastkeeper**

9.     Inland Empire Waterkeeper is a program of Orange County Coastkeeper.  Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

10.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California, with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

11.     Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around the Santa Ana River watershed.  Coastkeeper, and its program, Waterkeeper, are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters.  To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

12.     Waterkeeper members use and enjoy the Receiving Waters, including the Santa Ana River, Lytle Creek, and Cajon Creek, into which polluted storm water and non-storm water from the Facility is discharged.

/ / /

4

13.     Waterkeeper members use and enjoy the Receiving Waters for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, and engaging in scientific study, including monitoring activities.

14.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Receiving Waters, and impair Waterkeeper's members' use and enjoyment of those waters.

15.     The Facility's polluted discharges are ongoing and continuous.  Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by the Facility owners' and/or operators' failure to comply with the Clean Water Act and the Storm Water Permit.

**B.     The Facility Owners and/or Operators**

16.     Waterkeeper is informed, and believes, and therefore alleges that San Bernardino Steel is an owner and/or operator of the Facility.

17.     Waterkeeper is informed, and believes, and therefore alleges that San Bernardino Steel is an active corporation in California.

18.     Waterkeeper is informed, and believes, and therefore alleges that the name and address of the Registered Agent for San Bernardino Steel is Peter J. Avila, 3003 East Hammer Lane, Stockton, California 95212.

19.     Waterkeeper is informed, and believes, and therefore alleges that The Herrick Corporation is an owner and/or operator of the Facility.

20.     Waterkeeper is informed, and believes, and therefore alleges that The Herrick Corporation is an active corporation registered in California.

21.     Waterkeeper is informed, and believes, and therefore alleges that the name and address of the Registered Agent for The Herrick Corporation is CT Corporation System, 818 West Seventh Street, 2nd Floor, Los Angeles, California 90017.

/ / /

III. **LEGAL BACKGROUND**

A. **The Clean Water Act: Storm Water**

22.     The Clean Water Act requires point source discharges of pollutants to navigable waters to be regulated by an NPDES permit.  33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into water of the United States unless the discharge complies with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollution Discharge Elimination System ("NPDES") permit issued under authority of the Clean Water Act's Section 402, 33 U.S.C. §§ 1311(a) and 1342(b).

24.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

25.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source."  40 C.F.R. § 122.2.

26.     The term "point source" means any "discernible, confined, and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14); 40 C.F.R. § 122.2.

27.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide."  33 U.S.C. § 1362(7).

28.     The EPA has promulgated regulations defining "waters of the United States."  40 C.F.R. § 122.2.  The EPA interprets "waters of the United States" to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters that include intermittent streams that could affect interstate commerce.

29.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.  *Rapanos v. United States,* 47 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters."  *Rapanos, supra,* 547 U.S. at 779; *N. Cal. River Watch, supra,* 496 F.3d at 999-1000.

30.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling.  *Rapanos, supra,* 547 U.S. at 782; *N. Cal. River Watch, supra,* 496 F.3d at 1000-1001.

31.     Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), establishes a framework for regulating industrial storm water discharges under the NPDES program.

32.     Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs may regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide general NPDES permit applicable to all industrial storm water dischargers.  *Id.*

33.     Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation."  33 U.S.C. §§ 1365(a)(i) and 1365(f).

34.     The term "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).

35.     Defendant San Bernardino Steel is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

36.     Defendant The Herrick Corporation is a "person" within the meaning of section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.     Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a) authorizes actions for injunctive relief.

38.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day for violations occurring after January 12, 2009.  33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009).

39.     Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.  33 U.S.C. § 1365(d).

**B.     California's Industrial Storm Water Permit**

40.     California is a state approved by the United States Environmental Protection Agency to administer an NPDES program under Section 402(b) of the Clean Water Act, 33 U.S.C. § 1342(b).

41.     California has designated the State Water Resources Control Board and its regional water quality control boards to administer its NPDES program.  *City of*

*Rancho Cucamonga v. Regional Water Quality Control Bd.,* 135 Cal. App. 4th 1377, 1380-81 (2006).

42.    The State Water Board is charged with regulating pollutants to protect California's water resources.  Cal. Water Code § 13001.

43.    The State Water Board has adopted the Storm Water Permit as a statewide general NPDES permit pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342(b); *see also* 40 C.F.R. § 123.25 (2005).

44.    In California, in order to discharge storm water law lawfully, industrial dischargers must obtain coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NDPES permit.  Storm Water Permit, Finding #2.  Before beginning industrial operations, dischargers must apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Water Board.  Storm Water Permit, Finding #3.

45.    Violations of the Storm Water Permit are also violations of the Clean Water Act.  Storm Water Permit, Section C(1) (Standard Provisions).

**C.    The Storm Water Permit's Effluent Limitations, Receiving Water Limitations, and Discharge Prohibitions.**

46.    Except as authorized and regulated by the Storm Water Permit, industrial facilities such as SBS are prohibited from discharging materials other than storm water ("non-storm water discharges") either directly or indirectly to waters of the United States.  Storm Water Permit, Discharge Prohibition (A)(1).

47.    Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.  Storm Water Permit, Discharge Prohibition A(1).

48.     The Storm Water Permit requires dischargers under its coverage to reduce or prevent pollutants associated with industrial activity in storm water discharges by implementing "Best Available Technology Economically Achievable" ("BAT") for toxic or non-conventional pollutants, and "Best Conventional Pollutant Control Technology" ("BCT") for conventional pollutants. Storm Water Permit, Effluent Limitation B(3). Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.  Conventional pollutants are listed at 40 C.F.R. § 401.16 and include total suspended solids ("TSS"), oil and grease, pH, biochemical oxygen demand, and fecal coliform.  Nonconventional pollutants include any pollutant not listed as a conventional pollutant or toxic pollutant.

49.     The Storm Water Permit prohibits storm water discharges and non-storm water discharges from adversely impacting human health or the environment. Storm Water Permit, Receiving Water Limitation C(1).

50.     The Storm Water Permit also prohibits storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."  Storm Water Permit, Receiving Water Limitation C(2).

51.     Water Quality Standards are pollutant concentration levels that the State Water Board, the various Regional Water Boards, and the U.S. EPA have determined to be protective of the beneficial uses of the waters that receive polluted discharges.

52.     The Facility is located within the jurisdiction of the California Regional Water Quality Control Board, Santa Ana Region ("Santa Ana Regional Water Board)" and is subject to Water Quality Standards set by that regional water board.

53.     In the Water Quality Control Plan for the Santa Ana River Basin (Basin Plan), California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011)("Basin Plan"), the Regional Water Board has identified the "Beneficial Uses" of water bodies in its region.  Santa Ana River Basin Water

Quality Control Plan, available at

http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtmal.

54.     The Facility discharges polluted storm water into Cable Creek, which flows into the Devil Creek diversion and Cajon Creek, joining Lytle Creek downstream, and then connecting with Reach 4 of the Santa Ana River, which discharges into the Pacific Ocean.

55.     The Beneficial Uses for Cable Creek include: Municipal and Domestic Supply; Water Contact Recreation; Non-contact Water Recreation; Groundwater Recharge; Warm Freshwater Habitat; Cold Freshwater Habitat; and Wildlife Habitat. Basin Plan at Table 3-1.

56.     The Beneficial Uses for Devil Creek and Cajon Creek include: Municipal and Domestic Supply; Water Contact Recreation; Non-contact Water Recreation; Groundwater Recharge; Cold Freshwater Habitat; and Wildlife Habitat. Basin Plan at Table 3-1.  For Cajon Creek specifically, Beneficial Uses include Rare, Threatened or Endangered Species as well.  Basin Plan at Table 3-1.

57.     The Beneficial Uses for Lytle Creek include: Municipal and Domestic Supply; Agricultural Supply; Industrial Service Supply; Industrial Process Supply; Hydropower Generation; Water Contact Recreation; Non-contact Water Recreation; Groundwater Recharge; Cold Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species.  Basin Plan at Table 3-1.

58.     The Beneficial Uses for Reaches 3 and 4 of the Santa Ana River include: Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Agricultural Supply; Rare, Threatened or Endangered Species; Warm Freshwater Habitat; and Wildlife Habitat.  Basin Plan at Table 3-1.

59.     Surface waters that cannot support the Beneficial Uses of waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act.  According to the 2010 303(d) List of Impaired Water Bodies, Reach 3 of the Santa Ana River is impaired for copper and lead.  Polluted

discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic dependent wildlife.

60.     Discharges of pollutants at levels above Water Quality Standards contribute to the impairment of the Beneficial Uses of waters receiving the discharges.

61.     Water Quality Standards applicable to discharges covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38 (2009).

62.     The CTR criteria are set to protect human health and the environment in the State of California.  Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

63.     EPA has issued an NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("2008 MSGP Permit") that includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

64.     The Benchmark values provide an objective level to determine whether a facility's storm water pollution prevention measures have been successfully implemented. MSGP Fact Sheet, at 95 (2008), available at http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

65.     Discharges from an industrial facility that contain pollutant levels exceeding EPA Benchmark values indicate that the facility has not developed and/or implemented Best Management Practices to achieve BAT for toxic pollutants and/or BCT for conventional pollutants.  *See* 2008 MSGP Permit at 56574.

66.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

67.     Discharges with pollutant levels that exceed CTR criteria, the Basin Plan, and/or other applicable Water Quality Standards are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

68.     When a permittee's discharges exceed Receiving Waters Limitations, it is required to submit a written report identifying what additional BMPs it will implement to achieve water quality standards.  Storm Water Permit, Receiving Water Limitations C(3) and C(4).

69.     Unauthorized discharges of materials other than storm water (non-stormwater) are violations of Discharge Prohibition A(1) of the Storm Water Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

70.     The Storm Water Permit requires dischargers to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit before commencing industrial activities. Storm Water Permit, Section A(1) and Provision E(2).

71.     SWPPPs assist facilities with identifying and evaluating sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent storm water from being exposed to pollutants, and to reduce or prevent the discharge of polluted storm water from industrial facilities.  Storm Water Permit, Section A(2).

72.     The Storm Water Permit requires that the SWPPP include a site map that contains: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a); the location of the storm water collection, conveyance and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of

the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section A(4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(3)).

73.     The SWPPP must include a list of significant materials handled and stored at the site.  Storm Water Permit Section A(5).

74.     The SWPPP must include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges.  At a minimum, the discharger must consider industrial processes, material handling and storage leaks, and locations where soil erosion may occur.  Storm Water Permit, Section A(6)(a)(i)-(vi).

75.     The SWPPP must include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.  Storm Water Permit Section A(6)(b).

76.     The SWPPP must include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges.  Storm Water Permit Section A(7)(a).  The SWPPP must also include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in the storm water discharges.  Storm Water Permit Section A(7)(b).

77.     The SWPPP must also include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source.  BMPs shall be developed and implemented to reduce or prevent pollutants in storm water discharges.  Storm Water Permit Section A(8).  Dischargers must develop and implement structural and/or non-structural BMPs.  Storm Water Permit Sections A(8)(a) and (b).

78.     The discharger must evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit.  Storm Water Permit Section A(9).  The discharger must conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate and properly maintained or whether additional BMPs are needed, as well as a visual inspection of equipment needed to implement the SWPPP.  Storm Water Permit Section A(9)(a)-(c).  The discharger must also submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger has complied with the Storm Water Permit.  Storm Water Permit Section A(9) (d)(i)-(vi).  If it cannot provide the certification of compliance, the discharger must explain in its evaluation report why it is not in compliance with the Storm Water Permit.  Storm Water Permit Section A(9)(d).  The evaluation report is submitted as part of the required annual report.  Storm Water Permit Section B(14).

79.     The discharger must revise the SWPPP as necessary before changing any industrial activities, or as otherwise required by the Storm Water Permit.  Storm Water Permit Section A(10).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

80.     The Storm Water Permit requires dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") before commencing industrial activities.  Storm Water Permit Provision E(3) and Section B(1).

81. The M&RP's objectives are to ensure that a facility has adequately developed and implemented BMPs and revised them if necessary, and ensure that the facility's storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit Sections B(2)(a) & (2)(b).

82. The M&RP assists with the facility's implementation and revision of its SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit Sections B(2)(c) & (2)(d).

83. The facility "shall" revise the M&RP as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit Section B(2)(d).

84. The Storm Water Permit further requires dischargers to conduct monthly visual observations of storm water discharges during the first hour of discharge and at all discharge locations during the wet season, defined as October 1 through May 30 annually. Storm Water Permit Section B(4)(a).

85. The Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Storm Water Permit Section B(4)(c). The same provision requires dischargers to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. Dischargers must also revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit Section B(4)(c).

86. The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Sections B(5) & (7).

87. Dischargers must collect storm water samples from all discharge locations during the first hour of discharge from the first storm event of the season

and from at least one other storm event during the wet season.  Storm Water Permit Section B(5)(a).  Facility operators who do not collect samples from the first storm event of the wet season are still required to collect samples from two other storm events of the wet season and must explain in facility's Annual Report why the first storm event was not sampled.  *Id.*

88.     Sampling conducted pursuant to the Storm Water Permit must occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.  Storm Water Permit Section B(5)(b).

89.     All dischargers covered under the Storm Water Permit are required to analyze each sample for pH, specific conductance, total suspended solids ("TSS"), and total organic carbon ("TOC").  A discharger may substitute an analysis for oil and grease ("O&G") instead of TOC.  Storm Water Permit Section B(5)(c)(i).

90.     Dischargers must also analyze each storm water discharge sample for toxic chemicals and other pollutants likely to be present in significant quantities.  Storm Water Permit Section B(c)(ii).

91.     Facilities must also analyze any additional parameters listed in Table D of the Storm Water Permit, which depend upon the facility's SIC code.  Storm Water Permit Section B(5)(c)(iii).

92.     Table D of the Storm Water Permit requires facilities classified as Sector AA (which includes SIC Codes 3441), such as the Facility, to analyze storm water samples for zinc, iron, aluminum, and nitrate + nitrate.  Storm Water Permit, Table D, Sector AA and Section B(5)(c)(iii), or as required by the Regional Water Board.

93.     The Storm Water Permit requires that dischargers submit an Annual Report to the applicable regional water board by July 1 of each year.  The Annual Report must include a summary of visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement

any activities required, and the records specified in Section B(13).  Storm Water

Permit, Section B(14).

## V.   FACTUAL BACKGROUND

### A.   The Facility's Storm Water Permit Coverage

94.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators filed a Notice of Intent to Obtain Coverage under the Storm Water Permit ("NOI") for its industrial operations in 1992 and again in 1997.

95.   Waterkeeper is informed and believes, and therefore alleges, that the Facility's 1992 NOI identified The Herrick Corporation as the Owner/Operator of San Bernardino Steel.  Waterkeeper is informed and believes, and therefore alleges, that the Facility's 1997 NOI identified The Herrick Corporation as the Facility's Operator.

96.   Waterkeeper is informed and believes, and therefore alleges, that the 1992 and 1997 NOIs identified the address for The Herrick Corporation as 7021 Koll Center Parkway, Pleasanton, California 94566-3115.

97.   The NOIs list the Facility WDID number as 8-36S002420.

98.   The State Board's electronic database, called the Strom Water Multiple Application & Report Tracking System ("SMARTS"), lists the current SBS Facility WDID number as 8-36I002420.

99.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

100.  Waterkeeper is informed and believes, and therefore alleges, that the 1992 and 1997 NOIs identified the Facility's address as 5454 North Industrial Parkway, San Bernardino, California 92407-1859.

101.  Waterkeeper is informed and believes, and therefore alleges, that the 1997 NOI lists San Bernardino Steel's Standard Industrial Classification codes of regulated industrial activity as 3441 (fabricated structural metal).

18

102.  Waterkeeper is informed and believes, and therefore alleges, that the 1992 NOI states that the Facility is 48 acres.  Waterkeeper is also informed and believes, and therefore alleges, that the Facility's SWPPP lists the site as spanning an area of approximately sixty (60) acres.

103.  A facility classified as SIC code 3441 requires Storm Water Permit coverage for the entire facility. Storm Water Permit, Attachment 1, Section 2.

104.  Waterkeeper is informed and believes, and therefore alleges, that the Facility is approximately thirty (30) percent impervious, and that the site includes two (2) driveways, a concrete trench, a parking area, and four roofed buildings used as offices and manufacturing facilities.

105.  Waterkeeper is informed and believes, and therefore alleges, that the site includes areas where diesel fuel and oil are stored, and where truck fueling and shipping activities occur.

106.  Waterkeeper is informed and believes, and therefore alleges, that steel staging and storage and material handling for this steel fabrication facility are handled outdoors.

107.  Waterkeeper is informed and believes, and therefore alleges, that the Facility generates approximately 498,630 gallons of storm water runoff per inch of rain.

108.  Waterkeeper is informed and believes, and therefore alleges, that the Facility is sited on a generally flat surface with no significant sloping, and has two (2) storm water and non-stormwater discharge points.

109.  Waterkeeper is informed and believes, and therefore alleges, that storm water and non-storm water discharges from the Facility discharge to Receiving Waters, specifically to Cable Creek Channel, which flows into the Devil Creek Diversion Channel, which connects to Cajon Creek, which joins Lytle Creek, discharging to Reach 4 of the Santa Ana River, and eventually the Pacific Ocean.

### B.     Industrial Activities at the Facility

110.    Waterkeeper is informed and believes, and therefore alleges, that the Facility is a structural steel fabrication facility that fabricates columns for large, multi-story, steel frame buildings.  Activities that commonly occur at such facilities include metal preparation; parts/tools cleaning; metal surface cleaning; painting operations; surface treatment; clean up of spills and drips; galvanizing; heavy equipment use and storage; materials storage; and equipment/vehicle maintenance. Each of these activities is a potential pollutant source through the fluids, solvents, cleaners, cuttings, scraps, turning, fines, containers, coatings, and fuel created by the fabrication process or required to maintain it.

111.    Waterkeeper is informed and believes, and therefore alleges, that pollutants associated with operations at the Facility include, but are not limited to: metals (including zinc, copper, aluminum, nickel, lead, manganese, and iron); spent solvents; chemical oxygen demand; brass; Teflon; hexavalent chromium; fuels; paints; solvents; mineral spirits; aromatic solvents; oil and grease; chromates; and pH-affecting substances.

112.    Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' service and maintenance of heavy equipment and vehicles at the Facility generate hazardous wastes.

113.    Waterkeeper is informed and believes, and therefore alleges, that the Facility handles and stores paint, diesel fuel, lubricating and hydraulic oils and welding supplies outdoors without adequate cover to prevent storm water exposures to pollutant sources.

114.    Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators conduct some, or all, of its industrial operations and vehicle and equipment maintenance outdoors, without adequate cover to prevent storm water exposure to pollutant sources.

115.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators conduct some, or all, of its industrial operations and vehicle and equipment maintenance outdoors, without sufficient secondary containment or other measures to prevent polluted storm water from discharging from the Facility.

116.   Waterkeeper is informed and believes, and therefore alleges, that pollutants associated with the Facility have been, and continue to be, tracked throughout the Facility.  This results in trucks and vehicles tracking sediment, dirt, fugitive dust, metal particles, oil and grease, and other pollutants off-site.  These activities are all significant pollutant sources at the Facility.

117.   Waterkeeper is informed and believes, and therefore alleges, that the Facility also discharges process waters from equipment washing, dust suppression, and other activities as part of its industrial operations.

118.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water into Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

119.   Waterkeeper is informed and believes, and therefore alleges, the Facility Owners' and/or Operators' failure to develop and/or implement required BMPs also results in discharges of prohibited non-storm water in violation of the Storm Water Permit and Clean Water Act.

120.   The Facility's failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from the Facility to the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

/ / /

### C.   Storm Water Discharge Points at the Facility

121.   Waterkeeper is informed and believes, and therefore alleges, that polluted storm water and prohibited non-storm water is discharged from the Facility to Receiving Waters via discharge points located at the Facility.

122.   Waterkeeper is informed and believes, and therefore alleges, that there are at least two (2) discharge points at the Facility.

123.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators collect storm water samples from both discharge points, identified in the SWPPP as Outfall 1 and Outfall 2.

124.   Waterkeeper is informed and believes, and therefore alleges, that Outfalls 1 and 2 are both located along the eastern boundary of the Facility, and discharge directly into a flood control channel.

125.   Waterkeeper is informed and believes, and therefore alleges, that both discharge points are located immediately adjacent to areas of raw materials storage and handling, and downgradient from areas where waste oil, fresh oil, and other sources of pollutants are located.

126.   Waterkeeper is informed and believes, and therefore, alleges, that the Facility's storm water discharges directly into Cable Creek.

### D.   The Waters Receiving the Facility's Storm Water Discharges

127.   Waterkeeper is informed and believes, and therefore alleges, that Defendants discharge polluted storm water associated with industrial activities from the Facility during every significant rain event, and any other time storm water discharges from the Facility.

128.   Waterkeeper is informed and believes, and therefore alleges, that pollutants discharge directly to Receiving Waters or via the County of San Bernardino's or other storm drain systems and into Receiving Waters.

129.   Waterkeeper is informed and believes, and therefore alleges, that the Receiving Waters into which the Facility discharges are waters of the United States.

130.   Waterkeeper is informed and believes, and therefore alleges, that each of the surface waters into which the Facility discharges polluted storm water are tributaries to traditional navigable waters, such as the Santa Ana River.

131.   Waterkeeper is informed and believes, and therefore alleges, that Cable Channel Creek has a significant nexus to the Santa Ana River and is a water of the United States within the jurisdiction of the Clean Water Act.  *Rapanos*, 547 U.S. at 780-81.

132.   Polluted discharges from the Facility contribute to the degradation of the Santa Ana River, an impaired surface water, and aquatic dependent wildlife.

**E.     The Storm Water Discharges at the Facility Contain Elevated Levels of Pollutants**

133.   Storm water discharges containing heavy metals such as copper and lead adversely affect the aquatic environment.

134.   Storm water discharge samples taken at the Facility contain levels of pollutants, including TSS, nickel, aluminum, iron, lead, and zinc*,* in excess of EPA Benchmarks.

135.   Waterkeeper is informed and believes, and therefore alleges, that repeated exceedances of EPA Benchmarks demonstrate that San Bernardino Steel has failed, and continues to fail, to develop and/or implement required BMPs at the Facility that achieve compliance with BAT/BCT standards in violation of Effluent Limitation B(3).

136.   Storm water discharge samples collected at the Facility contain levels of pollutants, including zinc and pH-altering substances*,* known to adversely impact aquatic species and the environment in excess of Water Quality Standards.

137.   Waterkeeper is informed and believes, and therefore alleges, that discharges from the Facility containing levels of pollutants, including TSS, aluminum, nickel, pH-altering substances,, iron, copper, lead, and zinc, known to

23

adversely impact aquatic species and the environment demonstrate that San Bernardino Steel's Owners and/or Operators have violated, and continue to violate, Receiving Water Limitation C(1).

138.   Waterkeeper is informed and believes, and therefore alleges, that exceedances of Water Quality Standards demonstrates that San Bernardino Steel's Owners and/or Operators have violated, and continue to violate, Receiving Water Limitation C(2).

139.   Waterkeeper is informed and believes, and therefore alleges, that during every significant rain event or any other storm water discharge that has occurred at the Facility since April 17, 2010 through the present, the Facility Owners and/or Operators has discharged, and continues to discharge, storm water from the Facility that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the EPA Benchmarks, and Water Quality Standards.

**F.    Defendants' Discharges of Prohibited Non-Storm Water**

140.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' use of water at the facility creates discharges from the Facility to the Receiving Waters through the storm drain system.

141.   Waterkeeper is informed and believes, and therefore alleges, that prohibited non-storm water discharges discharge from the Facility to the Receiving Waters in violation of Discharge Prohibition A(1).

142.   Waterkeeper is informed and believes, and therefore alleges, that abrasive blasting is performed outdoors at the Facility and contributes to dust generation that exposes storm water and non-storm water to pollutants.

143.   Waterkeeper is informed and believes, and therefore alleges, that trucks and other vehicles regularly travel onto, and from, the facility, tracking sediment, dirt, fugitive dust, oil and grease, metal particles, and other pollutants that expose storm water and non-storm water to pollutants.

144.   Waterkeeper is informed and believes, and therefore alleges, that the Facility may also engage in other ongoing activities that expose storm water and non-storm water to pollutants.

## G.   Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements

145.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to develop an adequate SWPPP for the Facility that complies with Section A of the Storm Water Permit.

146.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to develop an adequate site map for the Facility that includes descriptions of areas where dust and particulates may be generated; an outline of all impervious areas; or area of soil erosion, in violation of Section A(4) of the Storm Water Permit.

147.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to include within the SWPPP a narrative description of the Facility's industrial activities, including material handling and storage areas.  The SWPPP does not include the type, storage, and quantity of significant materials handled or stored, or a description of shipping, receiving and loading procedures.  These omissions fail to satisfy Section A(6) of the Storm Water Permit.

148.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to implement an adequate SWPPP for the Facility that complies with Section A of the Storm Water Permit.  Since at least April 17, 2010, polluted storm water has discharged from the Facility on dozens of occasions, putting the Facility on notice that its BMPs have failed to prevent storm water exposure to pollutants.  However, the existing SWPPP proposes no site improvements after an internal audit of the Facility.  The Facility's failure to revise the SWPPP after its samples show that BMPs are inadequate to

satisfy BAT/BCT standards is a violation of Section A(9) and A(10) of the Storm Water Permit.

### H.   Defendants' Failure to Comply with the Storm Water Permit's M&RP Requirements

149.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to develop an adequate M&RP for industrial operations at the Facility that complies with Section B and Provision E(3) of the Storm Water Permit.

150.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to implement an adequate M&RP for industrial operations at the Facility that complies with Section B of the Storm Water Permit.

151.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit, in violation of Sections B(3) and B(4) of the Storm Water Permit.

152.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to conduct quarterly visual observations of all drainage areas within the Facility for the presence of authorized and unauthorized non-storm water discharges, as required by Sections B(3) and B(4) of the Storm Water Permit.

153.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to document the source(s) of pollutants visually observed, or the response taken to reduce or prevent pollutants in storm water discharges, as required by Section B(4) of the Storm Water Permit.

154.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed to visually observe storm water discharges during the first hour of discharge in violation of Section B(4) of the Storm Water Permit.

155.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to collect samples of storm water discharges from each of the Facility's two (2) discharge points during the first storm event of the wet season and drawn during the first hour of discharge, in violation of Sections B(5), B(7), and B(15) of the Storm Water Permit.

156.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to analyze storm water discharge for all toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharges, including copper and lead, in violation of Section B(5)(c) of the Storm Water Permit.

157.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed, and continue to fail, to adequately revise the M&RP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section B and Provision E(3) of the Storm Water Permit.

**I.     Defendants' Failure to Comply with the Storm Water Permit's Reporting Requirements**

158.   Waterkeeper is informed and believes, and therefore alleges, that since at least April 17, 2010, the Facility Owners and/or Operators have failed to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

159.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in each of its past five (5) Annual Reports were erroneous because the Facility Owners and/or Operators have not evaluated, developed and/or implemented

adequate BMPs, or evaluated and revised the SWPPP, or the M&RP, as required by Sections A and B of the Storm Water Permit.

160.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to report visual observations of authorized and unauthorized non-storm water discharges in the Facility's Annual Reports for 2009-2010, 2010-2011, 2011-2012 and 2012-2013, as required by Section B(3) of the Storm Water Permit, and to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor or the source of any pollutants.

161.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators failed to submit Annual Reports that contained explanations of their failures to implement activities required by the Storm Water Permit in their Annual Reports, as required by Section B(14) of the Storm Water Permit.

162.   Waterkeeper is informed and believes, and therefore alleges, that the Annual Reports for the Facility are inaccurate because they indicate that the first rain events of the wet season were sampled but, in fact, the Facility Owners and/or Operators failed to sample the first rain event, as required by the Section B(5) of the Storm Water Permit, in violation of Sections C(9) and C(10) of the Storm Water Permit.  For example, the Facility Owners and/or Operators failed to sample the first rain event of the 2011-2012 wet season, yet the Annual Report inaccurately reported that the first sample collected from the wet season came from the first rain event.

163.   Waterkeeper is informed and believes, and therefore alleges, that the Annual Reports for the Facility are inaccurate because they fail to provide an explanation for why the first storm event of the wet season was not sampled, as required by Section A(5) of the Storm Water Permit.

164.   Waterkeeper is informed and believes, and therefore alleges, that for at least the past five (5) wet seasons addressed in the Annual Reports, the Facility

Owners and/or Operators failed to analyze and/or report storm water samples for all toxic chemicals likely to be present in the Facility's storm water discharges in significant quantities.

165.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed to submit mandatory noncompliance reports to the Regional Water Board as required by Section C(11)(d) of the Storm Water Permit.  For example, the Facility's sampling routinely discloses that storm water discharges contain elevated levels of pollutants but the Facility's Owners and/or Operators have reported that revisions to, or additions to, the Facility's BMPs are not necessary.  The Owners and/or Operators have further failed to include any proposal in the Facility's Annual Reports to prevent noncompliance from continuing, or to determine its cause or its duration.

166.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed to submit required reports when storm water discharges from the Facility exceed the Storm Water Permit Receiving Water Limitations identifying what additional BMPs will be implemented to achieve water quality standards, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act
by Discharging Pollutants Not in Compliance with an NPDES Permit.
33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

167.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

168.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have discharged, and continue to discharge,

pollutants from a point source to a water of the United States not in compliance with an NPDES Permit in violation of Section 301(a) of the Clean Water Act.

169.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have discharged, and continue to discharge, pollutants from a point source to a water of the United States not in compliance with an NPDES permit in violation of section 301(a) of the Clean Water Act.

170.   Every day that pollutants are discharged from the Facility to a water of the United States that is not in compliance with an NPDES permit is a separate and distinct violation of the Clean Water Act.

171.   The Facility Owners and/or Operators' violations of Clean Water Act section 301(a) are ongoing, and will continue each day that point source discharges of pollutants occur from the Facility to the Receiving Waters.

172.   San Bernardino Steel is subject to civil penalties for all violations of the Clean Water Act occurring since at least April 17, 2010.

173.   By committing the acts and omissions alleged above, San Bernardino Steel is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to sections 309(d) and 505 of the Clean Water Act, 33. U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

174.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue to commit the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California for which Waterkeeper has no plain, speedy, or adequate remedy at law.

175.   Plaintiffs pray for judgment against Defendants as set forth below.

/ / /

/ / /

**SECOND CAUSE OF ACTION**
**Violation of Section 301(a) of the Clean Water Act**
**by Discharging Contaminated Storm Water in Violation**
**of the Storm Water Permit's Effluent Limitations.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

176.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.   Waterkeeper is informed and believes, and therefore alleges, that storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards has discharged, and continues to discharge, from the Facility.

178.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' discharges of storm water containing levels of pollutants that do not achieve compliance with the BAT/BCT occur during every storm water discharge from the Facility.

179.   The Facility Owners and/or Operators violate the Storm Water Permit's Effluent Limitations B(3) each and every time the Facility discharges storm water containing levels of pollutants that do not achieve BAT/BCT standards.

180.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' violations of Effluent Limitations B(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

181.   The Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time the Facility discharges contaminated storm water in violation of Effluent Limitation B(3) of the Storm Water Permit.

182.   Each and every time the Facility Owners and/or Operators discharge contaminated storm water from the Facility in violation of Effluent Limitation B(3), it is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

183.   By committing the acts and omissions allege above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4 (2009).

184.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

185.   THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

### THIRD CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act**
**by Discharging Contaminated Storm Water in Violation**
**of the Storm Water Permit's Receiving Water Limitations.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

186.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

187.   Waterkeeper is informed and believes, and therefore alleges, that the Facility has discharged, and continues to discharge, storm water containing levels of pollutants that adversely impact human health and/or the environment.

188.   Waterkeeper is informed and believes, and therefore alleges, that when the Facility discharges storm water, the discharges contain levels of pollutants that adversely impact human health and/or the environment.

189.   Each and every time the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment, it violates Receiving Water Limitation C(1) of the Storm Water Permit.

190. Waterkeeper is informed and believes, and therefore alleges, that the Facility has discharged, and continues to discharge, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards.

191. Waterkeeper is informed and believes, and therefore alleges, that the Facility discharges storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards during every storm water discharge from the Facility.

192. Each and every time the Facility discharges storm water containing levels of pollutants that cause of contribute to exceedances of water quality standards, the Facility's Owners and/or Operators violate Receiving Water Limitation C(2).

193. Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

194. Each and every time contaminated storm water discharges from the Facility in violation of Receiving Water Limitations C(1) of the Storm Water Permit, the Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act.

195. Each and every violation of Receiving Water Limitations C(1) of the Storm Water Permit is a separate and distinct violation of Section 301of the Clean Water Act, 33 U.S.C. § 1311(a).

196. Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' violations of Receiving Water Limitation C(2) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

197. Each and every time contaminated storm water discharges from the Facility in violation of Receiving Water Limitations C(2) of the Storm Water Permit, the Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act.

198.   Each and every violation of Receiving Water Limitations C(2) of the Storm Water Permit is a separate and distinct violation of Section 301of the Clean Water Act, 33 U.S.C. § 1311(a).

199.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. § 19.4 (2009).

200.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

201.   THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## FOURTH CAUSE OF ACTION
### Violation of the Clean Water Act
### by Discharging Non-Storm Water in Violation
### of the Storm Water Permit's Discharge Prohibitions.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)

202.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

203.   Waterkeeper is informed and believes, and therefore alleges, that the Facility has discharged, and continues to discharge, prohibited non-storm water in violation of Discharge Prohibition A(1) of the Storm Water Permit each time the Facility Owners and/or Operators allow fugitive dust, dirt, and/or debris from abrasive blasting.

204.   Waterkeeper is informed and believes, and therefore alleges, that the Facility has discharged, and continues to discharge, prohibited non-storm water in

violation of Discharge Prohibition A(1) of the Storm Water Permit each time the Facility Owners and/or Operators fail to prevent fugitive dust, dirt, and/or debris from vehicle activities on-site and traveling off-site.

205.   Waterkeeper is informed and believes, and therefore alleges, that the Facility has discharged, and continues to discharge, prohibited non-storm water in violation of Discharge Prohibition A(1) of the Storm Water Permit each time the Facility Owners and/or Operators fail to prevent fugitive dust, dirt, and/or debris from materials handling and storage onsite.

206.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners' and/or Operators' violations of Discharge Prohibition A(1) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

207.   Each and every time non-storm water discharges from the Facility to a water of the United States in violation of Discharge Prohibition A(1) of the Storm Water Permit, the Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act.

208.   Each and every violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a).

209.   By committing the acts and omissions alleged above, the Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. § 19.4 (2009).

210.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

211.   THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

**FIFTH CAUSE OF ACTION**
**Violation of the Clean Water Act,**
**by Failing to Adequately Develop, Implement, Review, and/or Revise a**
**Storm Water Pollution Prevention Plan**
**in Violation of the Storm Water Permit.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

212.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

213.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately develop a SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

214.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately implement a SWPPP for the Facility, in violation of Section A and Provision E(2) of the Storm Water Permit.

215.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately revise a SWPPP for the Facility, in violation of Sections A(9) and A(10) of the Storm Water Permit.

216.   Every day from April 17, 2010 to the present, Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit.

217.   Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act at the Facility are ongoing and continuous.

218.   The Facility Owners and/or Operators will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the Clean Water Act each and every day that the Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

219.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the Clean Water Act.

220.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to sections 309(d) and 505 of the Clean Water Act, §§ 1319(d), 1365 and 40 C.F.R. § 19.4 (2009).

221.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

222.   THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

### SIXTH CAUSE OF ACTION
**Violation of the Clean Water Act,**
**by Failing to Adequately Develop, Implement, Review, and/or Revise a**
**Monitoring Program in Violation of the Storm Water Permit.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

223.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

224.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately develop and Monitoring and Reporting Program for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

225.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately implement a Monitoring and Reporting Program for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

226.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed, and continue to fail, to adequately revise a Monitoring and Reporting Program for the Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

227.   Every day from April 17, 2010 to the present, Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit at the Facility.

228.   Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

229.   The Facility Owners and/or Operators will continue to be in violation of Section B and Provision E(3) of the Storm Water Permit and the Clean Water Act each and every day they fail to adequately develop, implement, and/or revise a Monitoring and Reporting Program for the Facility.

230.   Each and every violation of the Storm Water Permit's Monitoring and Reporting Program requirements at the Facility is a separate and distinct violation of the Clean Water Act.

231.   By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to sections 309(d) and 505 of the Clean Water Act, §§ 1319(d), 1365 and 40 C.F.R. § 19.4 (2009).

232.   An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).  Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

233.   THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

/ / /

/ / /

**SEVENTH CAUSE OF ACTION**
**Violation of the Clean Water Act**
**by Failing to Report as Required by the Storm Water Permit**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) & 1365(f)**

234.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

235.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed to submit accurate Annual Reports for the Facility to the Regional Water Board in violation of Sections C(9) and C(10) of the Storm Water Permit.

236.   Waterkeeper is informed and believes, and therefore alleges, that the Facility's Annual Reports have not met the monitoring and reporting requirements of the Storm Water Permit in violation of Section B(14) of the Storm Water Permit.

237.   Waterkeeper is informed and believes, and therefore alleges, that the Facility's Annual Reports were, and will continue to be, inaccurate and/or incomplete by not including complete annual comprehensive site evaluations in violation of Sections A(9) and B(14) of the Storm Water Permit.

238.   Waterkeeper is informed and believes, and therefore alleges, that the Facility's Annual Reports were, and will continue to be, inaccurate in stating that the SWPPP's BMPs addressed existing potential pollutant sources when they did not, in violation of the Storm Water Permit Sections A(6) and B(14).

239.   Waterkeeper is informed and believes, and therefore alleges, that the Facility's Annual Reports failed, and continue to fail, to provide the explanations required by the Annual Report when there is non-compliance with the Storm Water Permit's terms, in violation of Section B(14) of the Storm Water Permit.

240.   Waterkeeper is informed and believes, and therefore alleges, that the Facility Owners and/or Operators have failed to submit written reports identifying what additional BMPs will be implemented to achieve Water Quality Standards even though the Facility's discharges exceeded receiving water Water Quality Standards,

in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

241. The Facility Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day the Facility operated without reporting, as required by Section B(14) of the Storm Water Permit.

242. The Facility Owners' and/or Operators' violations of the Reporting Requirements of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

243. The Facility has been in daily and continuous violation of Section B(14) of the Storm Water Permit every day since at least April 17, 2010.

244. By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from April 17, 2010 to the present, pursuant to sections 309(d) and 505 of the Clean Water Act, §§ 1319(d), 1365 and 40 C.F.R. § 19.4 (2009).

245. An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Allowing the Facility to continue committing the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

246. THEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## VII. RELIEF REQUESTED

247. Plaintiffs respectfully requests that this Court grant the following relief:

a. A court order declaring Defendants to have violated, and be in continuing violation of, the Storm Water Permit and Sections 301(a) and 402(p) of the Clean Water Act, 33 U.S.C. §§ 1311(a), for their discharges of pollutants not in compliance with the Storm Water Permit and violations of the substantive and procedural requirements of the Storm Water Permit;

b.    A court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.    A court order enjoining Defendants from discharging pollutants not in compliance with an NPDES permit;

d.    A court order assessing civil monetary penalties for each violation of the Clean Water Act, at $37,500.00 per day per violation, for violations occurring since April 17, 2010, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4 (2009);

e.    A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

f.    Any and all other relief as the Court may deem appropriate.


DATED:    June 28, 2015        Respectfully Submitted,

**LAW OFFICE OF JENNIFER F. NOVAK**


By__/s/ Jennifer F. Novak_____
    Jennifer F. Novak,
    *Counsel for Plaintiffs Orange County*
    *Coastkeeper and Inland Empire*
    *Waterkeeper*